# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

SEATTLE TIMES COMPANY,

    Plaintiff,

v.

NATIONAL SURETY CORPORATION;
GENERAL INSURANCE COMPANY
OF AMERICA; and TRAVELERS
CASUALTY AND SURETY COMPANY
(as successor-in-interest to Aetna Casualty
and Surety Company),

    Defendants.

C13-1463 TSZ

ORDER

    THIS MATTER comes before the Court on a motion brought by defendant General Insurance Company of America ("General"), docket no. 173, and joined by plaintiff Seattle Times Company ("Seattle Times"), docket no. 176, for (i) approval of a settlement between Seattle Times and General, (ii) an order barring future claims against General by co-defendants Travelers Casualty and Surety Company ("Travelers") and National Surety Corporation ("National"), and (iii) entry of partial judgment pursuant to Federal Rule of Civil Procedure 54(b). By Minute Order entered October 1, 2019, docket no. 189, the Court advised the parties of its tentative rulings concerning these requests, and directed the parties to file supplemental briefs indicating whether they consented or objected to the form of order attached to the Minute Order. Rather than submitting any briefs, the parties filed a "Proposed Stipulated Order", docket no. 192, that incorporates

ORDER - 1

1 with certain modifications, the conclusion section of the draft order attached to the earlier

2 Minute Order. The parties have articulated no objection to the substance of the Court's

3 proposed order, Attachment A to Minute Order (docket no. 189 at 3-22), and the Court,

4 having reviewed all papers filed in support of, and in opposition to, the pending motion,

5 now approves the proposed settlement as set forth in the following order.

6 **Background**

7     This matter concerns whether Seattle Times is entitled to indemnification under

8 various insurance policies issued by General, Travelers, and National for amounts either

9 already paid or still owed by Seattle Times to Touchstone SLU LLC and TB TS/RELP

10 LLC (collectively, "Touchstone") for remediation costs associated with hazardous

11 substances released on real property bounded by Fairview Avenue North, Thomas Street,

12 Boren Avenue North, and Harrison Street in Seattle, Washington (the "Property"). For

13 different years between 1976 and 1986, each insurer issued either a primary commercial

14 liability policy or an excess policy or both:

| Insurer | Type of Policy | Policy Period | Policy Limit |
|---------|----------------|---------------|--------------|
| General | primary | 1976-1979 | $300,000[1] |
| General | primary | 1979-1982 | $300,000[1] |
| General | primary | 1982-1985 | $300,000[1] |

---

[1] Each of General's primary policies was for a three-year period, with limits on property damage of $100,000 per occurrence and $100,000 in the aggregate for each year. <u>See</u> Feig Decl. at ¶ 10 & Exs. 1-3 (docket no. 174). General has already made payments totaling $640,779.32 to address unrelated claims against Seattle Times, and the unexhausted balance of the aggregate limits of General's primary policies is $259,220.68. <u>Id.</u> at ¶10.

ORDER - 2

| Insurer | Type of Policy | Policy Period | Policy Limit |
|---|---|---|---|
| Travelers | primary | 1985-1986 | $500,000 |
| General | excess (over $100,000 per year) | 1976-1979 | $6 million[2] |
| General | excess (over $100,000) | 1979-1980 | $5 million |
| General | excess (over $100,000) | 1980-1981 | $5 million |
| General | excess (over $100,000) | 1981-1982 | $5 million |
| General | excess (over $100,000) | 1982-1983 | $5 million |
| General | excess (over $100,000) | 1984-1985 | $5 million |
| Travelers | excess (over $500,000) | 1985-1986 | $10 million |
| National | excess (over $10.5 million) | 1985-1986 | $15 million |

*See* Exs. 1-9 to Feig Decl. (docket no. 174-1); Exs. 31 & 32 to Rumsey Decl. (docket nos. 133-31 & 133-32); Ex. A to Eckman Decl. (docket no. 180).

Seattle Times purchased the Property in 1985, while the third General primary policy (for 1982-1985) was still in effect, and continued to own the Property until 2011, when title to the Property passed to Touchstone pursuant to the terms of a purchase and sale agreement. In connection with the transfer of the Property, Seattle Times and Touchstone entered into an Environmental Remediation and Indemnity Agreement ("ERIA"), under which Seattle Times agreed to reimburse Touchstone for certain

---

[2] National has indicated that General's excess policy for 1976-1979 has "remaining limits" of only $2 million, *see* Resp. at 4 (docket no. 178), but the policy was for a three-year period with an annual aggregate limit of $2 million, *see* Ex. 4 to Feig Decl. (docket no. 174-1), resulting in a total policy limit of $6 million. The record contains no evidence that any portion of General's excess policy for 1976-1979 has been exhausted.

ORDER - 3

remedial costs, including the additional expenses of transporting and disposing of contaminated soil. To date, Seattle Times has paid Touchstone $4,783,434.17.

In the related matter of <u>Seattle Times Company v. LeatherCare, Inc., et al. v. Touchstone SLU LLC, et al.</u>, W.D. Wash. Case No. C15-1901 TSZ, the Court conducted an 18-day bench trial and ruled as follows:

>   (1) The total amount due from Seattle Times to Touchstone pursuant to the ERIA is $8,160,527.61. Taking into account the sum already paid by Seattle Times, judgment was entered against Seattle Times and in favor of Touchstone, in connection with the ERIA claim, in the amount of $3,377,093.44. <u>See</u> Order at 117 (C15-1901 TSZ, docket no. 270); Judgment (C15-1901 TSZ, docket no. 271).
>
>   (2) The total recovery due to Touchstone, pursuant to either the ERIA or Washington's Model Toxics Control Act ("MTCA"), for remediation expenses already incurred, is $8,364,111.02. Of this amount, the sum allocated to Seattle Times is $2,928,678.78, which consists of (i) $429,211.77 for costs due solely under the ERIA, (ii) $283,762.64 in groundwater treatment and regulatory review expenses, and (iii) $2,215,704.37 in contaminated soil transportation and disposal costs. <u>See</u> Order at 118 (C15-1901 TSZ, docket no. 270). The balance ($5,435,432.24) of Touchstone's total recovery was allocated, pursuant to MTCA, to LeatherCare, Inc. ("LeatherCare"), which leased a portion of, and operated a dry cleaning business on, the Property for over 25 years.

*See id.* at 29-33 & 117. LeatherCare's obligation to Touchstone was reduced by the amount already paid by Seattle Times that was over the sum allocated to it, and Seattle Times is entitled to reimbursement from LeatherCare in the amount of $1,854,755.39.

  (3) Any future response costs relating to groundwater treatment, regulatory review, or operation of the injection wells installed at the Property are equitably allocated as follows: 31/103 to Seattle Times, 29/103 to LeatherCare, and 43/103 to Touchstone. *See id.* at 120.

  (4) Seattle Times is required to pay $398,889.73 to Touchstone in reasonable attorneys' fees pursuant to the ERIA and/or MTCA. *See* Order at 7 (C15-1901 TSZ, docket no. 328).[3]

  (5) Seattle Times is required to pay $117,488.60 to Steven Ritt and the marital community composed of Steven Ritt and Laurie Rosen-Ritt (collectively, "Ritt") in reasonable attorneys' fees pursuant to MTCA. *See* Order at 6 (C15-1901 TSZ, docket no. 336). Seattle Times also owes $10,029.66 to Ritt in taxable costs. *See* Order at 1-2 (C15-1901 TSZ, docket no. 338).

---

[3] Touchstone also seeks $23,604.61 in costs against both Seattle Times and LeatherCare. *See* Bill of Costs (C15-1901 TSZ, docket no. 307). Touchstone's untimely request for costs was treated as a motion for extension of time to tax costs in the manner set forth in Local Civil Rule 54(d). *See* Order at 1 n.1 (C15-1901 TSZ, docket no. 328). Touchstone appealed this ruling, and its motion for extension of time to tax costs has been stayed pending a decision of the United States Court of Appeals for the Ninth Circuit. *See id.*

The Court takes judicial notice of the fact that Touchstone sold the Property earlier this year for $740 million. *See* <u>Seattle Times</u> (March 26, 2019) (Ex. A to Flannery Decl., Ex. A to Reply (docket no. 351-1 in Case No. C15-1901 TSZ)). The purchaser, Ponte Gadea Seattle LLC, has entered into a consent decree with the Washington Department of Ecology ("Ecology") pursuant to which it has agreed *inter alia* to maintain the injection wells installed at the Property, monitor the groundwater, perform in-situ groundwater treatment if needed, and operate a ventilation system designed to minimize contaminated vapors in the subsurface parking garage. *See* Ex. B to Marten Decl. (docket no. 188-1). Since the Court's ruling in August 2018, Touchstone has continued to incur costs relating to groundwater treatment, regulatory review, and/or operation of the various injection wells, and it has sought reimbursement from Seattle Times on a quarterly basis. *See* Ex. E to Marten Decl. (docket no. 188-1 at 105-07). Touchstone requested that Seattle Times pay $56,562.60 in December 2018, and $9,869.80 in March 2019, to satisfy its share (31/103) of future response costs. *Id.*

A. **Proposed Settlement**

In this matter, General seeks to resolve the pending declaratory judgment and breach of contract claims against it by paying Seattle Times as follows:

(i) $3.8 million "in settlement of the Insurance Action," meaning this lawsuit;

(ii) $63,759.00 for the attorneys' fees and costs owed to Ritt; and

(iii) $95,969.39 in litigation expenses incurred by Seattle Times.

*See* Ex. 10 to Feig Decl. (docket no. 174-1). As part of such settlement, General wishes to bar Travelers and National from bringing against it any claim for contribution, allocation, subrogation, or equitable indemnification.

ORDER - 6

### B. Non-Settling Defendants' Positions

Travelers opposes General's motion on the ground that the "bar order" proposed by General does not adequately protect Travelers from being required to pay amounts for which General should be held responsible. Travelers further objects to entry of a final judgment because, in light of the ongoing appeal in the related ERIA/MTCA case, the requisite showing of "no just reason for delay," <u>see</u> Fed. R. Civ. P. 54(b), cannot be made. National does not object to General's settlement with Seattle Times, but it takes the position that a "bar order" is appropriate only if Seattle Times agrees that National has no exposure on its high-level excess policy and can be dismissed with prejudice from this lawsuit.

### Discussion

### A. Applicable Law

Federal courts generally adhere to a policy of promoting settlement before trial. <u>See</u> <u>Franklin v. Kaypro Corp.</u>, 884 F.2d 1222, 1225 (9th Cir. 1989). The Court must, however, proceed cautiously when, in a matter involving multiple parties, fewer than all parties wish to settle. <u>See</u> <u>id.</u> In such cases, "settling defendants cannot obtain finality unless a 'bar order' is entered." <u>Id.</u> A "bar order" discharges all of the obligations of the settling defendants and prohibits the non-settling defendants from asserting claims for contribution or indemnification against the settling defendants. <u>See id.</u> Before entering a "bar order," the Court must be satisfied that the proposed settlement is reasonable and that the "bar order" protects the non-settling defendants by limiting their liability to the amount for which they would be proportionately responsible if the settling defendants

1  had remained in the case. *See id.* at 1232; *see also Zidell Marine Corp. v. Beneficial Fire & Cas. Ins. Co.*, 2004 WL 7308662 at *2 (W.D. Wash. May 24, 2004).

Under Washington law, all insurers on a risk during the time of an occurrence or a loss have a joint and several obligation to provide full coverage in the absence of any applicable exclusions or defenses. *See Am. Nat'l Fire Ins. Co. v. B & L Trucking & Constr. Co.*, 134 Wn.2d 413, 424, 951 P.2d 250 (1998). When an insured has sued multiple insurers and settled with one or more of them, the non-settling insurers bear the burden of proving the insured would receive a "double recovery" before they will be allowed a setoff as to the settlement funds. *See Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 672-73, 15 P.3d 115 (2000); *see also Puget Sound Energy, Inc. v. Alba Gen'l Ins. Co.*, 149 Wn.2d 135, 68 P.3d 1061 (2003). This "anti-setoff" doctrine is designed to fully compensate the insured before any setoff is allowed. *Weyerhaueser*, 142 Wn.2d at 672.

When, however, the non-settling insurers are subject to a "bar order" precluding them from seeking contribution or indemnification from the settling insurers, the anti-setoff rule should not be applied in a manner that is inconsistent with the Washington Supreme Court's guidance concerning how a property loss should be apportioned between insurers when two or more policies provide coverage. *See Mission Ins. Co. v. Allendale Mut. Ins. Co.*, 95 Wn.2d 464, 626 P.2d 505 (1981). In *Mission*, the Washington Supreme Court described three approaches to allocating a loss among different policies, namely (i) prorating the loss in accordance with the policy limits; (ii) prorating the loss in proportion to the premiums paid by the insured; and (iii) using

ORDER - 8

the "maximum loss" methodology. *See id.* at 465. After rejecting the first two methods, the *Mission* Court adopted the "maximum loss" standard, pursuant to which each policy contributes equally until the limit of the smaller policy is reached, and any remaining portion of the loss is then paid from the larger policy up to its limits. *Id.* at 466-68.

B. **Maximum Loss Rule**

The Court must analyze the effect of the "maximum loss" rule to evaluate the reasonableness of the proposed settlement between Seattle Times and General, and to understand how a related "bar order" might affect Travelers and National. In doing so, the Court does not mean to suggest in any way that coverage is owed under the policies at issue or that the exclusions or other defenses on which the insurers rely lack merit.

Moreover, in applying the "maximum loss" system of apportionment, the Court must take in account that General's primary policies for 1976-1979, 1979-1982, and 1982-1984, as well as its excess policies for 1976-1979, 1979-1980, 1980-1981, 1981-1982, and 1982-1983, predated the purchase of the Property by Seattle Times. Thus, those policies cannot be considered in allocating among the insurers the costs related to excavation and disposal of contaminated soil for which Seattle Times is liable by virtue of its ownership of the Property and/or pursuant to its subsequently executed contract with Touchstone, namely the ERIA signed in 2010.

General's earlier policies are at issue, however, when apportioning between insurers both the past and future groundwater treatment expenses because an additional or alternative source of groundwater contamination was the adjacent property (*i.e.*, the "1120 John Block" owned by Seattle Times), where Seattle Times conducted its printing

business during the period when those primary and excess policies were in effect (*i.e.*, 1976-1983). <u>See</u> Order at 34 & 51-52 (C15-1901 TSZ, docket no. 270).

Finally, in assessing the insurers' respective exposures, the Court is mindful that, although Touchstone has been awarded judgment against Seattle Times under the ERIA for over $8.1 million (setoff by the roughly $4.78 million that Seattle Times has already paid), the amount apportioned to Seattle Times (about $2.93 million) is substantially less, and Touchstone may pursue recovery of the difference from LeatherCare.

With the above caveats in mind, the "maximum loss" technique would yield the following results, which inform the Court as to the reasonableness of the proposed settlement:

| Table 1 | | | |
| --- | --- | --- | --- |
| Soil Remediation Expenses Owed Under the ERIA (But Not Under MTCA) | | | |
| **Policy** | **Policy Limit** | **Amount Allocated to Policy** | **Unexhausted Balance** |
| General primary (1984-1985) | $100,000 | $100,000.00 | $0.00 |
| General excess (1984-1985) | $5 million | $164,605.89 | $4,835,394.11 |
| Travelers primary (1985-1986) | $500,000 | $164,605.88 | $335,394.12 |
| **TOTAL** | | $429,211.77 | |

In Table 1, the first $300,000 of the $429,211.77 owed under the ERIA is distributed evenly among the three policies, and the remaining $129,211.77 is allocated 50% to General's excess policy and 50% to Travelers's primary policy.

ORDER - 10

| | | Table 2 | | |
|---|---|---|---|---|
| | | **Soil Remediation Expenses** <br> **Owed Under the ERIA and Allocated Under MTCA** | | |
| **Policy** | **Policy Limit** | **Unexhausted Balance (PRIOR)** | **Allocated to Policy** | **Unexhausted Balance (NEW)** |
| General primary (1984-1985) | $100,000 | $0.00 | exhausted | $0.00 |
| General excess (1984-1985) | $5 million | $4,835,394.11 | $3,525,143.56 | $1,310,250.55 |
| Travelers primary (1985-1986) | $500,000 | $335,394.12 | $335,394.12 | $0.00 |
| Travelers excess (1985-1986) | $10 million | $10,000,000.00 | $3,525,143.56 | $6,474,856.44 |
| **TOTAL** | | | $7,385,681.24 | |

In Table 2, the first $335,394.12 of the $7,385,681.24 that is owed under the ERIA, and allocated between Seattle Times and LeatherCare under MTCA, is apportioned to the unexhausted balance of Travelers's primary policy. The balance of $7,050,287.12 is then split between General's excess policy for 1984-1985 and Travelers's excess policy. The methodology used to generate Tables 1 and 2 does not take into account any coverage defenses, including those based on policy exclusions relating to liabilities assumed under a contract like the ERIA, and the Court makes no ruling concerning the merits of the various defenses asserted by the insurers.

| Table 3 |||||
|---|---|---|---|---|
| Groundwater Treatment and Regulatory Review Costs<br>Owed Under the ERIA and Allocated Under MTCA[4] |||||
| **Policy** | **Policy Limit** | **Unexhausted Balance** | **Allocated to Policy** | **Unexhausted Balance** |
| General primary (1976-1979) | $300,000 | $159,220.68[5] | $159,220.68 | $0.00 |
| General primary (1979-1982) | $300,000 | | | |
| General primary (1982-1984) | $200,000 | | | |
| General primary (1984-1985) | $100,000 | $0.00 | exhausted | $0.00 |
| General excess (1976-1979) | $6 million | $6,000,000.00 | $26,630.56 | all General excess policies: $27,150,467.19 |
| General excess (1979-1980) | $5 million | $5,000,000.00 | $26,630.56 | |
| General excess (1980-1981) | $5 million | $5,000,000.00 | $26,630.56 | |
| General excess (1981-1982) | $5 million | $5,000,000.00 | $26,630.56 | |
| General excess (1982-1983) | $5 million | $5,000,000.00 | $26,630.56 | |
| General excess (1984-1985) | $5 million | $1,310,250.55 | $26,630.56 | |

---

[4] The amount due under the ERIA for groundwater treatment and regulatory review costs is $345,634.60, while the amount allocated to Seattle Times under MTCA for the same expenses is $283,762.64. *See* Order at 104 & 116 (C15-1901 TSZ, docket no. 270). For purposes of the "maximum loss" calculations, the Court must use the higher figure.

[5] As indicated earlier, the unexhausted balance of the aggregate limits of General's primary policies is $259,220.68. *See supra* note 1. In the absence of specific information from the parties concerning how the unexhausted balance is distributed among General's primary policies, the Court allocated $100,000 to the primary policy for 1984-1985, which was in effect when Seattle Times acquired the Property, and the remaining $159,220.68 to the other policies.

ORDER - 12

| Policy | Policy Limit | Unexhausted Balance | Allocated to Policy | Unexhausted Balance |
|---|---|---|---|---|
| Travelers primary (1985-1986) | $500,000 | $0.00 | exhausted | $0.00 |
| Travelers excess (1985-1986) | $10 million | $6,474,856.44 | $26,630.56 | $6,448,225.88 |
| **TOTAL** | | | $345,634.60 | |

Unlike in Tables 1 and 2, in Table 3, General's primary policies for 1976-1979, 1979-1982, and 1982-1984 and its excess policies for 1976-1983 are included because the groundwater treatment costs addressed in Table 3 might be related to Seattle Times's ownership of the 1120 John Block during the periods for which those policies provide coverage. In Table 3, the first $159,220.68 of the $345,634.60 in groundwater treatment and regulatory review costs that are owed under the ERIA, and allocated under MTCA, is apportioned to General's primary policies for the period from 1976 through 1984; General's primary policy for 1984-1985 has already been deemed exhausted through this "maximum loss" analysis. The remaining $186,413.92 is divided seven ways[6] and allocated to each of the excess policies, six of which were issued by General, and the

---

[6] The Court recognizes that General's excess policy for 1976-1979 could be treated in three different ways, namely (i) as three policies with limits of $2 million each; (ii) as either three policies or one policy, as to which the "per occurrence" limit of $2 million operates as a cap on the amount of coverage for the groundwater treatment and regulatory review costs at issue; or (iii) as one policy with a limit of $6 million. If the first framework was applied, the balance of the remediation expenses would initially be split nine ways, resulting in a smaller share being allocated to Travelers. If the second approach was used, the limits of General's excess policy for 1976-1979 would be exhausted sooner than under the other two methods, which would be a less favorable outcome for Travelers. The Court has used the third option because it is consistent with the manner in which the parties have discussed the limits of General's primary policies, and it offers a mid-range view of the respective insurers' potential liabilities.

ORDER - 13

seventh of which was issued by Travelers. None of the past remediation expenses have been allocated to National's $15 million excess policy because the "maximum loss" estimate indicates that the underlying $10 million excess policy issued by Travelers would not be exhausted by the costs already incurred.

The totals of the past remediation amounts allocated to each insurer under the "maximum loss" rule, as reflected in Tables 1, 2, and 3, are as follows:

**Table 4**
**Summary of Tables 1, 2, and 3**

| Insurer | Total Allocated Per Insurer | Unexhausted Balance |
|---|---|---|
| General | $4,108,753.49 | $27,150,467.19 |
| Travelers | $4,051,774.12 | $6,448,225.88 |
| TOTAL | $8,160,527.61 | $33,598,693.07 |

The sums apportioned to each insurer under the "maximum loss" rule would, of course, be significantly reduced if LeatherCare contributes the amount allocated to it under MTCA. Moreover, Travelers's share would be substantially diminished if it were to prevail on one or more of the coverage defenses it asserts.

With respect to future groundwater treatment and related expenses, for which Seattle Times has been allocated a 31/103 share, the "maximum loss" analysis indicates that General would initially be apportioned 6/7ths of such costs and Travelers would bear the other 1/7th. The ratios would change as each excess policy was exhausted. General's excess policy for the period 1984-1985, with a remaining balance of $1.279 million, would be the first to exhaust, thereby leaving a 5/6 share for General and a 1/6 share for

ORDER - 14

1  Travelers. Travelers (and/or National) would not be solely responsible for future costs

2  until the limits on each of General's other excess policies was reached. These allocations

3  seem fair and reasonable given the number of years during which General issued policies

4  to Seattle Times and the limits of each policy.

5      **C.**    **Reasonableness Determination**

6      The Court is satisfied that the proposed settlement is the result of arm's-length

7  negotiations by parties represented by able counsel and assisted by an experienced

8  mediator, Jeff Kichaven, and that it was not the product of collusion or motivated by an

9  improper purpose. Having performed the "maximum loss" analysis, the Court concludes

10 that the terms of the proposed settlement between Seattle Times and General, namely

11 payment by General to Seattle Times of (i) $3.8 million in settlement of this "Insurance

12 Action," (ii) $63,759.00 for the attorneys' fees and costs owed to Ritt, and

13 (iii) $95,969.39 in litigation expenses incurred by Seattle Times, in exchange for a release

14 by Seattle Times of General's liability for "any and all Environmental Claims Relating to

15 the Site,"[7] *see* Ex. 10 to Feig Decl. (docket no. 174-1 at 31), are reasonable. The total

---

[7] The settlement agreement between Seattle Times and General defines "Site" as "that property located at 307 Fairview Ave. N; Seattle, WA 98109 [the "Troy Property"] and any place where hazardous substances allegedly originating from the Troy Property have allegedly come to be located at any time, including specifically, the property located at 1120 John Street; Seattle, WA." Ex. 10 to Feig Decl. (docket no. 174-1 at 23 & 29). The Court is aware that, in 2013, Seattle Times sold the "1120 John Block," which is bounded by Fairview Avenue North, John Street, Boren Avenue North, and Thomas Street, and where Seattle Times conducted its printing business for over 80 years, to Onni Denny Fairview (Land) LLC or Onni John Street (Land) LLC ("Onni"). *See* Ex. D to Marten Decl. (docket no. 188-1). In June 2018, Onni received notice that Ecology intends to treat it as a potentially liable person under MTCA with respect to a hazardous substance plume underlying the Property (or Troy Property) and extending into the 1120 John Block. *See id.* Onni has sought indemnification from Seattle Times pursuant to a contract signed in July 2013. *See id.* The Court understands Seattle Times to be releasing General from any insurance coverage obligation relating to Onni's current claim against Seattle Times. The

ORDER - 15

sum ($3,959,728.39) that General will pay to Seattle Times in settlement exceeds the aggregate ($3,545,123.78) of: (i) the past remediation expenses allocated to Seattle Times ($2,928,678.78); (ii) the attorneys' fees owed to Touchstone ($398,889.73); (iii) the costs sought by Touchstone ($23,604.61); (iv) the attorneys' fees and costs owed to Ritt ($127,518.26); and (v) the quarterly groundwater treatment and regulatory expenses Touchstone has demanded to date ($66,432.40). If LeatherCare contributes its full share to Touchstone's recovery and reimburses Seattle Times for the excess of what was already paid to Touchstone, then Seattle Times will have been made whole, and will also have over $400,000 in additional funds to apply toward any future groundwater treatment expenses.

On the other hand, if Seattle Times must fully satisfy the judgment that Touchstone received under the ERIA, then the liability portion ($3.8 million) of the settlement proceeds will represent almost 92.5% of the past remediation costs that would be apportioned to General (a little over $4.1 million) under the "maximum loss" rule (assuming that coverage is owed under all of the policies at issue). The deal struck between Seattle Times and General reasonably allocates to Seattle Times the risks that (i) the policies issued by Travelers (and National) will not afford any coverage, in which event the settlement funds would constitute less than 46.6% of amount owed pursuant to the ERIA, and Seattle Times would be uninsured for the remaining roughly 53.4%, and

---

Court does not, however, interpret the settlement agreement as discharging General with respect to any environmental claims that might arise as a result of hazardous substances released by Seattle Times during or in connection with its printing operations on the 1120 John Block.

that (ii) future groundwater treatment expenses and/or any remedial costs related to contaminants migrating from the Property to the 1120 John Block would be largely uninsured because, but for the settlement, they would have been allocated primarily to General's excess policies.

Thus, despite the uncertainty regarding future groundwater remediation and regulatory expenses, the Court can craft a "bar order" that will adequately protect the rights of all parties, including both Travelers and National. The Court DECLINES, however, to enter a partial judgment or to make the finding of "no just reason for delay" that is required to do so under Federal Rule of Civil Procedure 54(b). Seattle Times and General have reached a compromise of their claims and defenses in this matter, and judgment is unnecessary to effectuate the parties' settlement. A judgment is also not appropriate given that the Court has entered no decision on the merits of the pending declaratory judgment and/or breach of contract claims.

### D. National's Excess Policy

The "maximum loss" estimate indicates that the chances of National having coverage obligations to Seattle Times in connection with the remediation of the Property are de minimis. Although the "bar order" that General seeks must be binding on National for it to have full effect, Seattle Times has not shown why National must otherwise remain a party to this matter. The Court does not agree with National that it is entitled to dismissal with prejudice, given the possibility, however unlikely, that Touchstone's ERIA and/or MTCA claims against Seattle Times might exhaust the underlying policies issued by Travelers and trigger coverage under National's excess policy. The Court is,

however, convinced that the remaining declaratory judgment claim against National[8] should be dismissed without prejudice as unripe and premature. *See* <u>Century Indem. Co. v. Marine Group, LLC</u>, 848 F. Supp. 2d 1229, 1234-37 (D. Ore. 2012) (in determining whether a declaratory judgment action against an excess insurer presented a "case or controversy" conferring subject-matter jurisdiction, applying a standard requiring a "substantial," "practical," or "reasonable" likelihood that the claims at issue would exhaust the underlying policies).

**Conclusion**

For the foregoing reasons, the Court ORDERS:

(1) General's motion, docket no. 173, which is joined by Seattle Times, docket no. 176, is GRANTED in part and DENIED in part, as follows:

    (a) The terms of the proposed settlement between Seattle Times and General are reasonable, and the Court is satisfied that the proposed settlement is the result of arm's-length negotiations between parties represented by counsel and was not the product of collusion or motivated by an improper purpose;

    (b) The non-settling defendants, namely Travelers and National, are hereby barred from asserting any claim for contribution or indemnification against the settling defendant, namely General, and General is hereby barred from asserting any claim for contribution or indemnification against Travelers and/or National, in connection with or arising from the liabilities or obligations of Seattle

---

[8] The breach of contract claim asserted by Seattle Times against National was previously dismissed without prejudice. *See* Order (docket no. 126).

ORDER - 18

Times and/or LeatherCare as set forth in the orders and judgments in *Seattle Times Company v. LeatherCare, Inc., et al. v. Touchstone SLU LLC, et al.*, W.D. Wash. Case No. C15-1901 TSZ. This "bar order" does not apply to any claims for contribution or indemnification relating to insurance coverage claims as to which Seattle Times has not released General under the terms of their settlement agreement.

(c) Nothing in this Order shall be construed as a ruling on whether coverage is owed to Seattle Times under the insurance policies at issue or on whether any policy exclusions or other defenses apply. If Travelers and/or National is/are found to owe coverage to Seattle Times under their respective policies, then each insurer will be entitled to assert, in addition to any other defenses, the following defenses, on which the insurer will bear the burden of proof by a preponderance of the evidence: (i) setoff of the amount paid by General in settlement, provided that Seattle Times has been or will be fully compensated; and/or (ii) setoff of the amount that should have been allocated to General pursuant to the "maximum loss" doctrine applied in this Order, regardless of whether Seattle Times has been or will be fully compensated.

(d) Except as granted, General's motion, joined by Seattle Times, is DENIED. The Court DECLINES to enter partial judgment pursuant to Federal Rule of Civil Procedure 54(b).

(2) In light of the settlement, all claims asserted by Seattle Times against General are hereby DISMISSED with prejudice and without costs.

(3) The declaratory judgment claim asserted by Seattle Times against National is DISMISSED without prejudice as unripe and premature. Thus, the only matters remaining for trial are plaintiff's claims for declaratory judgment and breach of contract against Travelers. This case, however, remains stayed pending further order of the Court.

(4) The parties are REMINDED of their obligation to file a Joint Status Report, within fourteen (14) days after resolution of the underlying matter (Case No. C15-1901 TSZ), indicating (i) whether trial will be necessary in this case; (ii) if so, when they anticipate being prepared for trial; and (iii) if not, whether this case may be dismissed as moot. *See* Minute Order at ¶ 2 (docket no. 168).

(5) The Clerk is DIRECTED to update the docket to reflect the dismissal of all claims against General (with prejudice) and National (without prejudice) and to send a copy of this Order to all counsel of record.

IT IS SO ORDERED.

Dated this 12th day of November, 2019.

/s/ Thomas S. Zilly
Thomas S. Zilly
United States District Judge

ORDER - 20